In our final case of the day, No. 241186, Wudi Industrial v. Wong. Mr. Bono? Yes, Your Honor. Good to have you, sir. Same here, Your Honor. May it please the Court, let me start by saying it's a privilege to appear in front of this Court again. I always enjoy arguing in front of this Court, and I thank the Court for the time it's taking to consider this appeal, which, as you might appreciate, is very important to my client. Your Honor, this appeal raises two critical and controlling jurisdictional issues. The first issue is whether the District Court had subject matter jurisdiction to enter an extraterritorial injunction in joining trademark and use conduct in foreign countries. And the second jurisdictional issue is did the District Court have ancillary jurisdiction to entertain a breach of contract claim on a settlement agreement after a final judgment of dismissal with prejudice had been entered in the case. For purposes of those jurisdictional questions, the U.S. Supreme Court has rendered two controlling opinions, the Abitron opinion, which answers the extraterritorial question, and the Kokanen opinion, which answers the ancillary jurisdiction question. And both of those opinions answer the questions I presented on lack of jurisdiction in the negative. Your Honor, if we have time later in the argument, I would also like to address two critical substantive issues, if there's time, one being the complete absence of proof to sustain irreparable injury for an injunction, and the fact that paragraph 6B of the settlement agreement addresses targeted advertising. But for our purposes, I believe the jurisdictional issues answer the questions presented to this Court, because the questions are we have an injunction, and the Court has to decide is it going to sustain or reverse that injunction. And with all due respect to the District Judge, the Court has, under the new Abitron decision, which came out shortly after this Court had issued its prior opinion, so this is a new issue that has arisen in this case, under the Abitron opinion, the Supreme Court definitively held that the reach of the Lanham Act is domestic only, and that there's no jurisdiction. Is this injunction enforcing the Lanham Act, or is this injunction enforcing the settlement agreement? Well, Your Honors, your prior opinion, I believe, answers that question. Your prior opinion decided, as Judge King wrote, that the order at issue, which we're dealing with now, which is virtually verbatim the order that you were dealing with before, was an injunction and not an order of specific performance. Right, we know that. But my question for you was, is this an injunction enforcing the Lanham Act, or is this injunction enforcing a right under the settlement agreement? Yes. You also held, in the prior opinion, that the scope of the order at issue, the injunction, was far broader than the terms of the settlement agreement itself. And, in fact, that was one of the reasons Judge King cited in his... I'm sorry, I'm sure you're getting to an answer, but can you answer my question and then explain it? I just said it's not, because it is... I'm sorry, it's not what? It's not simply an enforcement of a settlement agreement. So is this, this is an injunction enforcing the Lanham Act? It's an injunction which derives, it's the court's authority to enter this injunction arises under the Lanham Act, which gave the court subject matter and the jurisdiction in the beginning. You have to understand, this case started where the only subject matter jurisdiction of the district court was the federal Lanham Act. There is no diversity jurisdiction. So it's subject matter jurisdiction is provided by the Lanham Act. It is circumscribed by the terms of the Lanham Act, as defined by the Supreme Court. It cannot exceed... Is your point that the parties were somehow restricted? The parties could not agree to a global settlement because they then, they went beyond this dispute and made agreements about things outside the United States. No, Your Honor, you have to... Now the court has entered an injunction to enforce this agreement that has obligations and responsibilities related to Europe, to other parts of the globe. But because this under the Lanham Act, the parties were forbidden from agreeing to restrict their behavior in other countries? Absolutely not, Your Honor. That is not the question that should be answered. You have to distinguish between the party's ability to enter into a contract, whereby they could decide to restrict activity. And if a party breached that contract, it would be subject in a court that had jurisdiction to an alleged breach of contract claim. And the parties could prove a breach if it was there and seek damages. The question is the remedy, the remedy of injunction. And the Supreme Court and the 10th Circuit now, and the 11th Circuit now following Abitron have all said, and the district courts below those cases have all said, for remedy purposes, an extraterritorial injunction which affects conduct in foreign countries is beyond the jurisdiction of the court in a trademark in use situation. Because the jurisdiction of the court is defined by Congress, right? When Congress passes the contract, it defines the limits of the court's power. It might be different in a case where the limits of the court's power are defined by a contract. I think that's the question that we need to address. And the answer to that is the court, there's cases that have been decided by the Fourth Circuit that it's clear that once jurisdiction is defined by the statute as interpreted by the Supreme Court, the parties are without power, so to speak, or without the ability to expand that jurisdiction by contract. So the parties cannot enter into a contract that would expand the jurisdiction of the court to enter the remedy of an extraterritorial injunction. And it's just the same way as general equitable powers of the court. The general equitable powers of the court under this court's precedents that we have cited cannot be used to expand the jurisdiction of the court where that is specified expressly by statute. You can't have a general equitable power that goes beyond the specific designation of the jurisdiction as interpreted by the Supreme Court as to what the statute does. So in answer to Your Honor's question, yes, the contract can give rise to obligations, the subject of which could be subject to a breach of contract claim or a damage claim. If there were any damages, which we respectfully submit there are no damages in this case, they have not submitted any evidence of damages, which is, again, required under Virginia law. The issue we're talking about here is the remedy of an extraterritorial injunction, not the rights of the parties to enter into it. An injunction saying comply with your contract. That injunction goes beyond what was agreed to in the contract as this court indicated in its prior opinion. That's why it was not a specific performance order. You're not saying we ruled on the scope of the contract, are you? No. No, you simply said that the order was not enforcing the precise terms of the contract, which under Virginia law is what is required for an order of specific performance, and you held that the injunction was beyond the terms of the contract and broader than it, and therefore that was another reason why it was an injunction and not simply an order of specific performance. And that's what Judge King wrote in his majority opinion. So as far as the Abitron decision and the jurisdiction is, it's a question that the extraterritorial injunction is what goes beyond the subject matter of the court's jurisdiction and why this injunction that was issued must be reversed and vacated. And the second jurisdictional question is the question of ancillary jurisdiction, because what we have here now, because Mr. Wong and his company have now argued to avoid the Abitron opinion that, well, we're only really talking about a breach of contract case. Well, the Supreme Court in the Kokanen case said that when you have a, in order to preserve ancillary jurisdiction, because of course there's no diversity jurisdiction here and therefore it would be simply a breach of contract claim, the Supreme Court said you must expressly reserve jurisdiction in the final judgment. And the way you do that is either you must set forth the terms of the settlement in the judgment, in the final judgment, therefore the order of the court becomes in effect what you're enforcing and not just the contract, or you expressly reserve jurisdiction to enforce the settlement in the final judgment. Here, Judge Hilton's opinion, if you read it, seems to overlook the fact that there was a final judgment entered in this case, and the final judgment did not contain the provisions of the settlement agreement. Now, correct me if I'm wrong, but isn't the chronology there was a final judgment and then an appeal, and the court reversed and sent it back? The final judgment was not reversed by this court. The final judgment was not vacated by this court. So you say there was an appeal of the final judgment, we left the final judgment in place, but somehow reversed and sent it back? You held that the court had not made, had not satisfied rules 52 and 65 for entry of the injunction order, which the order was entered prior to the final judgment. And the final judgment, there were two, if the court recalls, in the settlement agreement, there were two forms of final judgment, version A and version B. Now, version B had an express reservation of jurisdiction, ancillary jurisdiction, but version A that was entered by the court did not, and it dismissed with prejudice all of the claims of Mr. Wong, the police and his company, dismissed all those claims with prejudice. And that was, is still, that judgment is still in place. And therefore, under the Kokanon opinion of the Supreme Court, there's no ancillary jurisdiction now in this court, because there's no, in the district court, because there's no diversity jurisdiction. And so if the plaintiff wants to argue this is now just a breach of contract claim, he, there is no jurisdiction in the district court under the Kokanon opinion. It's a very strict ruling. It's a harsh ruling, but it's the Supreme Court's mandate that says, no, this is, this is how you do it. There is no reason to entertain federal jurisdiction of a breach of a settlement agreement unless you put it in the final judgment, and in fact, you're So we, we heard an appeal. We reversed and sent it back to a court without jurisdiction. The jurisdiction at that time was not an issue because it was a pre-judgment order that was being sent back. The court issued... But there was a pre-judgment order and then a final judgment. Correct. That concluded the case. So we have to somehow undo that to get the court back to pre-judgment status so we can re-evaluate that. No, there's no reason to do any of that. So you're saying when we sent it back, the district court no longer had jurisdiction. We sent it back to a court that no longer had jurisdiction over the case. No, no. You ordered us, you ordered us to do, to have the court satisfy the Rule 52 and 65 requirements for findings of fact and conclusions of law. And that's, we followed the court's order and that's what we did. And that was addressing the original injunction order of the court. So the issue we're raising now, post-judgment lack of ancillary jurisdiction, was not ripe at that time because we were dealing with an injunction which this court said was, was, was, had been issued prior to the judgment and which arose not out of the contract per se, but arose out of a ambit of ordering. When did the district court lose jurisdiction? When did the district court, well, it depends on what claim you're talking about. If it's a claim of whether the contract had been breached, if that's the claim you're addressing, whether there's a breach and whether there should be damages assessed. The court lost jurisdiction on that at the time of the final judgment because it wasn't preserved. The question of whether the injunction was properly entered was, was, was the question that was entered beforehand. And the court had jurisdiction at that time to entertain that, to, to hear that injunction question and to decide whether there was a basis. What happened with regard to that prior order was right after this court issued that order, the Supreme Court issued abitron and said, injunctions, extraterritorial injunctions are not available when you're dealing with an injunction that enforces a trademark use in commerce in a foreign country. And that's the new development here. And we, when we went back to the district court, in addition to submitting findings and facts, we also rose with the, with the court the abitron opinion and quite frankly, there's no jurisdiction to enter this injunction. And the district judge completely ignored that opinion, did not cite to it, did not consider it. And when we asked him on a follow-up motion that he didn't address it, he said, take it up with the, with the appeals court. And I'm not considering it. So I see my time is up. Did he say that in writing or did he say that in court? He said that in an order denying stay. He said, take it up with the appellate court. That's what he said. And I'll leave it up to you to decide what he meant by that. But that's what he did. The bottom line is we raised that issue. It was a new issue, first came out after this court's prior appeal from the Supreme Court and he did not address it. And we feel it is absolutely controlling in this case. I see my time is up. Thank you very much. Thank you. Mr. Riley. Yes, Your Honor. Thank you. May it please the court, Craig Riley here for Mr. Wong and his company. As this court previously found the parties dispute arises under a concurrent use agreement. That is the parties had agreed that they could continue to use their own trademarks subject to specific restrictions and negative covenants that are stated in the settlement agreement and this governed the worldwide promotion of their products. So what we have here is a case in which we are enforcing rights that arise under the concurrent use agreement which are governed by Virginia law and we are not bringing trademark infringement cases that arise under the Lanham Act. And I'll address the ancillary jurisdiction question first. I think Booty misreads the settlement agreement and the stay order as well as versions A and B of the final order. The settlement agreement in paragraph 10, this is found at the joint appendix at page 945, was filed with the court and the parties agreed to ask the court to retain jurisdiction over the entire settlement agreement. There are no sunset event, no expiration date, nor any limited duration of the retained jurisdiction. The stay order in the first paragraph says, ordered that the court will retain jurisdiction to enforce the settlement agreement. And then states in the second separate paragraph, and it is further ordered that this matter is stayed pending entry of the final judgment presented to the court pursuant to the settlement agreement. Essentially, the parties set up a two-step process for entering the final dismissal order. Version A, which was the one that was entered before this case was heard on appeal here, enters judgment for Woody on its complaint to reverse the TTAB ruling and dismisses my client's counterclaims. But that's all it did. It does not address, let alone terminate, the other provision in the stay order, which retains ancillary jurisdiction. Therefore, there is ancillary jurisdiction that survives the entry of the final judgment under two independent theories. First, even if the entry of final judgment somehow affected this court's jurisdiction or the district court's jurisdiction, this enforcement proceeding began during the stay period, was appealed, then returned to the district court for further findings and conclusions on that enforcement motion, and then appealed again. Thus, this appeal is simply a continuation of the enforcement proceeding that began during the stay period when ancillary jurisdiction unquestionably existed. And so ancillary jurisdiction over this continuing enforcement proceeding has not been displaced by the final judgment. Second, in a locatory order, particularly ones structured as the stay agreement was, are not extinguished by the entry of final judgment. But they merge into it. We cited a case to the court on this point at paragraph page 13 of our brief footnote 4. That is, version A and B were meant to be part and parcel with the stay order in order to affect the final disposition of the action. So there was a two-step final order here, the stay order first, retaining jurisdiction to enforce the settlement agreement, and then the version A or B that would be presented by the parties later. Mr. Bono points to version B and having certain savings clause in it about retaining jurisdiction that may be surplusage, but in any event, version B would have been a very different final order to be entered at that point. It assumed a breach by Rudy of the payment terms, which is what the court was staying the enforcement, staying the case for. So it enters a judgment, that second version, which didn't go into effect, enters judgment against Rudy on our counterclaims, affirms the TTAB ruling, which would have excluded Rudy from the United States market altogether, and enters a money judgment, net of any payments made to us. So it's granting actually affirmative relief to Wong in the second version. Again, that was not entered. The savings clause, and this is important language, says in addition to the relief that's actually granted in that version, all other terms of the settlement agreement remain in effect, and the court retains jurisdiction to enforce said remaining terms and conditions. This was simply to clarify that despite the affirmative awards of relief to my client, excluding them from the U.S. market, granting us a money judgment, that all the other relief did not merge into that. Abitron, I would like to address next, if the court doesn't have any further questions about that first point. This argument made by Rudy, I think, conflates statutory construction, subject matter jurisdiction, personal jurisdiction, and the court's equitable power. Abitron simply analyzes whether the modern test for the presumption against extraterritoriality, application of federal statutes, applies to the claims asserted under the Lanham Act. But the claims, as this court has held, arise under the concurrent use agreement. That's a contract, and that governs the party's use of their work marks worldwide, and the agreement is governed by Virginia law. They've even argued Virginia law to the court, so do we. Nobody's argued for any Lanham Act interpretations or applications. Nobody is seeking Lanham Act remedies here. We are seeking remedies under the contract. We cited the case of the AFCO decision, a district court decision, but it was the only one I could find where this distinction was raised, and in that case they said that the extraterritorial limitations on the application of federal statutes in that case, in particular the Lanham Act, do not apply when, as that case, and in this case, what we are arguing about is the party's rights under a concurrent use agreement, and in that case the court took action with respect to the defendant's use of marks in Saudi Arabia. So again, it was an extraterritorial act of relief that was sought. So the basis for jurisdiction for the district court to have entered an extraterritorial injunction are straightforward. It had ancillary jurisdiction as its subject matter jurisdiction, and that applies regardless of the grounds for the original jurisdiction, and applies regardless of the diversity of the parties. Throughout these enforcement proceedings, the district court has noted, and I think the court in the dissenting opinion, Your Honor, noted, the district court was exercising ancillary jurisdiction. So throughout these enforcement proceedings, the district court has exercised and noted its exercising ancillary jurisdiction to enforce the settlement agreement. What you have to have in order to enter an extraterritorial injunction is personal jurisdiction over the defendant. To that, Woody consented, and they don't dispute it. This is found in the joint appendix at page 945 in the settlement agreement, paragraph 10. They consent to jurisdiction that's binding. The court then, as we analyzed in our brief, has equitable power. If the court has personal jurisdiction over the defendant, it has the power to enjoin the defendant, whether the defendant is within or without the United States, or to order the defendant to take action, whether that is within or without the United States. Therefore, the district court having retained ancillary jurisdiction, having had personal jurisdiction over Woody, has the equitable power to enter an injunction that has extraterritorial reach. Woody has also complained that the district court didn't amply analyze the eBay factors. Judge Hilton's opinion is concise and amply states all of the First, the breach of this sort of agreement causes inherent injury and irreparable harm to the plaintiff. This is found in the Dewberry case, the district court decision by Judge O'Grady, which this court later affirmed, the Helix case, and the Long John Silver case, which we cited. The breach of a contract not to use a mark causes, in quotes, injury to the goodwill and an inherent injury to the goodwill and reputation of the plaintiff. You are not required to prove damages because we're not seeking damages. And under Virginia law, he said we didn't show damages which were required by Virginia law. The Virginia case law says injury or damage. And all the cases I've found where you've had equitable relief as the relief sought by the plaintiff, all you need to show is injury. Furthermore, under Virginia law, this is the Worry v. Bowes case, which this court cited in the Dewberry opinion. There is no need to show actual damages. Rather, you only need to show that the breach, quote, may result in injury, close quote. So the Dewberry case, citing Worry v. Bowes, and I'm quoting from the Fourth Circuit's opinion here, reputational harm is sufficient to demonstrate irreparable injury flowing from the breach of a settlement agreement restricting the breaching party's use of a trade bargain. This is also echoed in the cases we've cited, the Blue Cross, Helix, and Long John Silver cases, and the Dewberry District Court opinion, that a breach of this sort of a contract causes reputational harm, it's inherent, and it's irreparable harm for which damages are inadequate. With respect to the public interest factor under eBay, again, this was analyzed in the Dewberry opinion, the Helix, and Long John Silver cases. It says you enforce contracts regarding the restriction of use of marks to prevent consumer confusion and to encourage the public's understanding that contract rights will be enforced. Those are the public interests served by the injunction here. They argue about the hardships. Again, they ignore that there's inherent injury to my client. We basically set up fences. You stay on your side of the fence. We'll stay on our side of the fence. We've done that. They have not. And as soon as they cross over the fence, they say, well, it doesn't harm you. You have plenty of space in your lot. I'll just take some of it. No. That's why we built the fences in the first place. I think they made an unclean hands argument that kind of of that variety, well, they didn't comply with other parts. Is that, that's an equitable claim. Is that part of this equitable balancing of the harms in the eBay factors that were considered, the harm and the damage done by each side? It can be, yes. But I think what we have here is this unjust enrichment claim was extensively briefed and vigorously argued below by Woody. And it's unmistakable that Judge Hilton rejected it. Now, I'll acknowledge he doesn't say that in so many words in his decision. But in his balance of the harms, he found that the balance favored Wong. Is that? Yes. That's correct. That's correct. But just on that point, I think the evidence that was presented was incompetent. It was simply waved around by counsel at the 2022 hearing before Judge Hilton the first time he heard this and entered the specific performance enforcement order. And it was not verified by a declaration at that time. It's not, none of that has, and they failed to provide any notice in advance of asserting that defense, which is, of course, a contract prerequisite to asserting any sort of a claim of a breach for any sort of relief. So we've analyzed this in our brief that they really didn't meet any of the criteria for the evidence or the legal impact of it. But it's certainly in the balance of equities, Judge Hilton did not credit it as a reason to not enter the injunction. And then one of the other arguments that they made repeatedly, and this was more in their first appeal and in the first district court hearing on this, was that this was somehow, causes no harm to my client but somehow grievously damages them. This is what they agreed to do. And now they're coming in and saying, well, it was more expensive than we thought it was going to be and therefore it's onwards. Well, that's not the way it works. And it's not even right under the, if you look at the agreement. The agreement, we anticipated that this was going to come up and we agreed to these specific limitations. We said it's only limited to three classes of products. It is only limited to the ECO. And we already pre-approved a dozen other marks that they could use freely in the Europe. These are called the European marks. And these are found, identified at page 955 of the joint appendix. There's no question that we anticipated that some of these restrictions would cause some problem, but here are the ways to solve it. Not only that, but they acknowledged in 2022 that they also had the ability on social media to use geo-blocking as another way to ameliorate the effects of this. For all those reasons, this is not an onerous provision and the balance of hardships has not shifted them. With respect to they said, oh, it causes damages, they were the ones asserting money damages. They never specified even an amount, only just made these unquantified arguments, which is not sufficient under the law. If I could turn to the substantive arguments about the meaning of paragraph 6B, these restrictions are aimed at consumer keyword surging. Their twin aims of paragraph 6B are to limit Woody's keyword purchases from search engines and shopping sites, and then second, to limit Woody's content posted on social media platforms that may be accessed and viewed in the ECO. These twin aims are stated in different prohibitory language. The first clause says, Woody shall not, will not buy from search engines and shopping sites. That limits the purchase of meta-tags, keywords to trigger paid search results. The second clause states, Woody will not use GT Racing on Facebook and other social media platforms. That clearly limits content posted on Woody's social media. Each time the parties in this This is found in paragraphs 4, paragraphs 5, paragraph 6A, and paragraph 6B. The first clause, again, limits Woody's right to generate paid search results by purchasing GT Racing as a keyword meta-tag, such as a Google AdWord, from search engines or shopping sites accessible in the ECO. The second clause limits their ability to generate natural search results by using GT Racing as content on its social media platforms that are accessible in the ECO. Importantly, they argue now, oh, those are audience targeting limitations. No, these are brand names of theirs that we're limiting, and none of the restricted terms deal with audience targeting or audience demographics, age, location, and so on like that, which is what other tools that they now are proffering. By the way, we submit in violation of the mandate rule, they submitted 400 pages of new declarations, new exhibits, new arguments of counsel, new contentions, and new theories of their defense, all when we got back in front of Judge Hilton a second time after this Court remanded it. The paragraph 6 limitations are solely aimed at restricting results generated by consumer keyword searches. Now, their argument that it applies to, oh, no, no, what it really applies to is these hidden meta-tags is defeated by their own client's declaration in 2022. In 2022, Mr. Wu Peng says that paragraph 6B constitutes, quote, social media restrictions that prevent Woody from using his GT racing mark or the words GT racing or GT space racing in connection with certain goods in the ECO. They also admitted that these were accessible and could be viewed in the ECO. In paragraph 14, that was paragraph 9, Joint Appendix page 195, Joint Appendix page 196, paragraphs 14 and 15, Woody's global media is available and accessible, using the same words we do to describe how you use the Internet, Woody's global social media is available and accessible on the Internet. It is inevitable that individuals in ECO countries could be able to access these applications and view Woody's promotions and advertisements. He clearly, Mr. Wu Peng clearly understands that 6B was content as well as meta-tags here because he's saying that it can be viewed. You view content, the meta-tags, as this court has analyzed in prior opinions, is invisible to the viewer, the user accessing the web page. So it's talking about content. They also admit in paragraph 15 and 16 that there's, I see I'm running out of time. I've got a question I want to ask you. Yes, sir. Why don't I get right to that then. But costs, you made a motion for costs? You made a motion for costs and they were awarded by? With respect to the motion below, we made an application to the court for fees. For fees. Correct. And the judge, I think his opinion says you're awarded fees or costs. I thought it would say costs. And they say that you made a motion and the agreement required you to file a lawsuit. Yes, your honor. And that is the argument that they made. I am following your question. And we simply cite, it's a very broadly worded provision. It uses the word suit. You have to file a suit. The difference between motion and a suit, but the cost, and they were awarded, but there's no number anywhere. He's, this is a typical practice with the Eastern District Alexandria judges and Judge Hilton. So it's not final as to that. I would make a filing, I made a filing add to that and he just didn't, it's still sitting in his chambers, I'm sure. The award was made. He ruled in your favor. Judge Hilton ruled in your favor. And I was $15,000. I don't have that number off the top of my head. But it was not included in his order because, again, he directed me to make an application, which I did. They say, maybe it's in the reply brief, that you didn't file a lawsuit and the agreement requires a suit. Yes. All you did was make a motion. That's correct. Do you agree with them on that point or not? I agree with it. The word used by the parties was that the, if the failing party files a suit. And we pointed out, Black's Law Dictionary, that suit is actually a generic word for any sort of an application to the court for a remedy. So you're saying that in the context that there's a motion, there's a suit. All right. Yes. That's as far as we take it, Your Honor. You just got a motion. All right. I have a question to respond to a little more fulsome. In the reply brief, page nine, it says that an interpretation of the paragraph 6B is a blanket social media restriction. If we do that interpretation that broad as the district court did, it would prohibit Woody from promoting his products elsewhere in the world outside of the ECO, just because the same social media posts also happen to be accessible in the EEOC via Internet. I mean, they paid $4.5 million for something. Basically, that interpretation would be the benefit of the bargain is just sort of evaporates. No. And we addressed this in our brief, but I will address that directly. No, the $4.5 million was part of the bundle of rights and restrictions that the parties exchanged. We had a, our counterclaim for trademark infringement damages had a number of $10 million or disgorgement of their profits. So that was one thing that they bought with the $4.5 million. Further, they bought the right to sell products in the United States, which was barred by the TTAB ruling, which we agreed we would walk away from. And we assigned certain rights to them in the EU and the UK, which both have separate trademark regimes. So they got a lot more than just... Respond to the part that said, but it's that blanket type interpretation would also impact the markets beyond the EEOC, Carl. Otherwise, it's pretty broad, isn't it? The, the restrictions on the ECO, again, the parties both had in mind, and in fact, this is in Woody's 2022 declaration as well. They understand that there is geo-blocking that allows them to carve out the ECO. If they want to throw out their internet, social media marketing throughout the world, they can use geo-blocking to block out my client's protected territory. Or they can market all their other products through global social media, including anything outside the restricted three classes of document, of goods. So they have other rights that they could use, or they could switch over and in their global social media use any of the 12 pre-approved trademark and branding rights that we gave them. So we're not restricting them from doing, implementing a global social media marketing promotion, but they agreed to certain restrictions. We agreed to ameliorate those restrictions by limiting it to the ECO, or three classes of products, and to have pre-approved other trade names and brand names they could use for their products there. So this is not a situation where they are forced to shutter, as they've sort of come in with their hair on fire exclaiming, oh, we have to shutter all our social media platforms. That's not the case at all. We anticipated this, and they also anticipated using geo-blocking. Not required by the agreement, but certainly available to them, and they know it. And this is something that they have used on certain social media platforms, but not on others. This is in Mr. Wu Peng's 2022 declaration. With my time having expired, I would ask the Court to affirm Judge Hilton's ruling here and the injunction, and I thank the Court for its time. Thank you, Mr. Rowley. Mr. Bono? Thank you, Your Honor. Nothing counsel stated undermines or takes away from the fact that under ABITRON, the injunction is beyond the subject matter of the District Court. Virginia law cannot expand a federal court's limited jurisdiction beyond what the statute provides as interpreted by the Supreme Court. He stood up here and said the Court can do that under Virginia law. No, it can't. He said the Court can do this under its general equitable powers. No, it can't. He said the Court can do it because of the party's contract terms. No, it can't. None of those can expand the Court's subject matter jurisdiction. Federal courts, as you know, are courts of limited jurisdiction. They get the jurisdiction from the Constitution or federal statutes as interpreted by the Supreme Court, period. It is a strict application. I would like to note he cites to the stay order and avoids the fact that the judgment did not preserve jurisdiction. The Supreme Court in the Coquitlam opinion, whether you agree with it or not, it is the law of the of dismissal or judgment or have an independent basis for that contract claim. And here we have no diversity of citizenship jurisdiction and there's no jurisdiction. He quotes the Court's interim stay order, which was right after the settlement agreement was entered, but prior to the judgment, which was over a year later. The stay order does not provide you with any reservation of jurisdiction once the judgment is entered. The Supreme Court says that in coconut. You cannot do that. And the order itself, the stay order itself says it's in effect pending entry of the final judgment. So on its face, it expires and the reservation of jurisdiction expires upon entry of the final judgment. He ignores the fact that, as I said earlier, the final judgment excluded, the parties purposely took out the reservation of ancillary jurisdiction in the version of the judgment that was entered. It was in the other version of the judgment. Nothing could be clearer, I submit to this Court, than the purposeful agreement of the parties to remove ancillary jurisdiction. In fact, coconut says the only time, the only way you keep jurisdiction if the parties agree to put it in the dismissal order. Here it was just the opposite. The parties expressly took it out, having written it in the other version. So nothing could be clearer. Now, I would like to comment briefly on irreparable injury that I alluded to before. There is no, and he rests his entire claim on that element of the eBay factor on presumption of irreparable injury. You don't just get presumption of irreparable injury in a vacuum. You have to put in proof, some proof of harm to reputation, to goodwill, to customer confusion, to loss of sales, something. You have to have a basis, a predicate for harm. You don't just say, oh, I can rest on a presumption of irreparable injury. The only evidence that he rests on of irreparable injury is one sentence in a declaration by Mr. Wong that was filed 32 months ago, in which he says, oh, the viewing of these social media posts causes, you know, affects my online advertising. That's what he says. First of all, that's insufficient in itself, even if we were here on April 1, 2022, because there's no facts to support it. So it's a conclusory statement. It doesn't support the fact, the fact. You have to show fact of harm to reputation before you get the presumption. And here we sit 32 months later. There is no evidence in this record, no evidence. For 32 months, they had the opportunity to put it in in front of Judge Hilton. They decided not to. No evidence of harm, no evidence of injury, no evidence of damages, no evidence of reputation, customer confusion, lost sales, lost revenues, lost customer inquiries, nothing. And they want an injunction because they say, oh, we have a presumption of irreparable harm. They haven't sustained their burden. The TTAB earlier found a likelihood of confusion because of the similarity of the marks. Yes, Your Honor. That was at that time under that standard. But here we sit. Here we sit with a record, and now we're years later. And the question is, where is the harm to reputation? They said the marks could be confusing. But we don't have any evidence of harm to reputation or harm to goodwill. The essence of irreparable harm to presumption is their reputation has been harmed, their goodwill has been harmed, and it's difficult to prove damages. That's why you have the harm. Here, significantly, this order, the injunction restricts conduct in 53 countries. Fifty-three countries. And there's no evidence except for two instances, and I'll get to those, but there's no evidence for 51 countries of any use of wrongs, trademarks, or economic activity in 51 of those countries. And as this Court has held in the case we cited in our brief, you must have use in commerce in order to assert irreparable harm to your reputation and goodwill when you have a trademark dispute. There's no evidence. You do not know whether in Latvia he even uses this mark or he even sells his products, or Estonia. You don't know whether he uses this mark or he even sells his products, or Estonia. So Scotland is on Wong to establish those facts. He put in nothing. And as far as Scotland, his declaration from, again, 32 months ago, he, Wong says, I went online and I managed to get some access to some videos or postings. Well, he's a computer wizard who knows what he did in order to draw that out of the Internet. I'm sorry. All right. I will stop my argument unless the Court wants me to raise any other issue. Thank you very much.
judges: Robert B. King, Roger L. Gregory, Allison J. Rushing